UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

ELLA D. McCLELLAN,                    )
                                      )
              Plaintiff,              )
                                      )        No. 2:10-CV-118
v.                                    )
                                      )        *Mattice / Lee*
COMMISSIONER OF SOCIAL SECURITY,      )
                                      )
              Defendant.              )

## REPORT AND RECOMMENDATION

This action was brought by Plaintiff Ella D. McClellan pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security

("Commissioner" or "Defendant") denying her supplemental security income ("SSI") benefits.

Plaintiff and Defendant have filed cross motions for summary judgment [Doc. 12, Doc. 14]. Plaintiff

seeks the award of benefits, or in the alternative, a remand to the Commissioner. In summary,

Plaintiff argues the Administrative Law Judge ("ALJ") should have found that she was disabled due

to mental retardation.

For the reasons stated below, I **RECOMMEND** that: (1) Plaintiff's motion for summary

judgment [Doc. 12] be **GRANTED**; (2) Defendant's motion for summary judgment [Doc. 14] be

**DENIED**; (3) the decision of Commissioner be **REVERSED**; and (4) this action be **REMANDED**.

## I.    ADMINISTRATIVE PROCEEDINGS

On April 4, 2006, at the age of 36, Plaintiff applied for SSI benefits, alleging she became

disabled in November 2005 due to "back problems, left knee problems, [and] right arm problems"

(Tr. 74, 88). Her claim was denied initially and upon reconsideration, with an acknowledgment that

she suffered from physical pain and a mental condition (Tr. 47, 52). Plaintiff requested a hearing,

which was held in March 2008 (Tr. 31, 53). Plaintiff was not represented at the hearing, and she alleged only back and arm pain (Tr. 31, 33-36). The ALJ determined that Plaintiff was not disabled (Tr. 16-26). After her claim was denied, Plaintiff retained counsel, who argued to the Appeals Council that the ALJ erred by failing to consider whether Plaintiff was mentally retarded (Tr. 142-44). The Appeals Council, however, found that the ALJ "fully considered and evaluated the evidence and reached the appropriate conclusion on the issues." (Tr. 2). Thus, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (Tr. 1).

Following this adverse decision, Plaintiff filed a new application for benefits on February 17, 2009, and she was awarded benefits from that date forward (Tr. 2). The favorable determination lists "learning disability" as Plaintiff's primary diagnosis [Doc. 13-1 at 1]. In this appeal, therefore, Plaintiff seeks benefits only for the time period between April 4, 2006, and February 17, 2009.

## II.    FACTUAL BACKGROUND

Plaintiff does not allege any error with respect to the ALJ's findings relating to her physical conditions or mental conditions other than mental retardation. Therefore, the facts recited herein will focus on Plaintiff's alleged mental retardation and will not specifically address the facts related to her other impairments.

### A.    Plaintiff's Education and Background

Plaintiff worked in the past as a fast food cook (Tr. 89), but the ALJ found she had not performed any substantial gainful activity within the past 15 years (Tr. 24). She was held back in the first grade, and she left school after completing the eighth grade (Tr. 94, 164). She reportedly moved between schools frequently because her father was a truck driver, and she left school to help

take care of her younger siblings (Tr. 164). In the seventh and eighth grades, Plaintiff took special education classes in all subjects (Tr. 94, 164, 214). Plaintiff can, however, read and write (Tr. 88). Plaintiff enrolled in a GED program in 2003 (Tr. 164), but the record does not show that she ever earned her GED certificate. She also participated in rehabilitative vocational training for janitorial services in 2006 (Tr. 95).

Plaintiff has two daughters, and she cares for them by cooking, doing laundry, and grocery shopping (Tr. 35). She enjoys watching television, and she would like to play sports, but she reports she cannot do so because of her physical condition (Tr. 114). She alleges she cannot pay attention for long periods of time and cannot follow spoken instructions well, but she can follow written instructions "very well" (Tr. 115).

### B. Plaintiff's Medical Records

In May 2002, Karl W. Konrad, Ph.D., M.D., examined Plaintiff for her complaints of back pain (Tr. 160). During that examination, under the heading "Mental Status," Dr. Konrad noted that Plaintiff's memory "for events surrounding [his] exam and for personal history [were] normal" and that she "[c]linically appear[ed] to be of average intelligence." (Tr. 161).

In 2005, Plaintiff was examined on two occasions by Donna L. Crosswait, M.Ed., a licensed psychological examiner (Tr. 164-72). In June 2005, Ms. Crosswait evaluated Plaintiff's "current level of intellectual functioning, academic achievement, and adaptive behavior" in order to "make educational recommendations" (Tr. 164). Plaintiff told Ms. Crosswait that she did not consider herself capable of performing work; she said she had once worked in a mini-blind factory, but the job was too hard for her (Tr. 164). Plaintiff had "much difficulty concentrating" during the testing, and she had a "very limited range of vocabulary" (Tr. 165). Plaintiff was motivated and cooperative

during testing, and Ms. Crosswait believed the test results accurately represented her intellectual, academic, and adaptive abilities (Tr. 165).

Ms. Crosswait administered the Wechsler Adult Intelligence Scale test ("WAIS-III"), on which Plaintiff obtained a verbal IQ of 63, a performance IQ of 76, and a full-scale IQ of 66 (Tr. 165). According to Ms. Crosswait, those scores placed Plaintiff in the "extremely low" range of intellectual functioning—in the first percentile (Tr. 165). Ms. Crosswait was able to say with 95% confidence that Plaintiff's "actual" full-scale IQ score was somewhere between 63 ("extremely low") and 71 ("borderline") (Tr. 165). Because Plaintiff's full-scale IQ score was less than 70, Ms. Crosswait administered another test, the Adaptive Behavior Assessment System ("ABAS-II"), to "rule out" mental retardation (Tr. 166). Plaintiff scored 86, and Ms. Crosswait was able to say with 95% confidence that her true score was between 83 and 89, which placed Plaintiff in the 18th percentile, or the "below average" range of adaptive functioning (Tr. 166). Academically, Ms. Crosswait opined that Plaintiff's abilities were in the "low average" range, or around the same level as a ten-year-old (Tr. 167). Plaintiff obtained a Total Achievement score of 86 on the Woodcock-Johnson test of cognitive abilities ("WJ-III"), which placed her in the 17th percentile (Tr. 167). Ms. Crosswait did not believe that Plaintiff met the criteria for any "specific learning disabilities" (Tr. 167), but the lack of a specific learning disability is not inconsistent with mental retardation.[1]

[1] In opining that Plaintiff did not meet the criteria for any specific learning disabilities, Ms. Crosswait stated that she used the methods approved by the Tennessee Department of Education. Under that department's policy, "specific learning disabilities" are identified when there is a severe discrepancy between the subject's cognitive ability (as measured, for example, by IQ) and actual educational performance. "Specific learning disabilities" (e.g., perceptual disabilities, dyslexia) do not include mental retardation, presumably because a person who suffers from mental retardation will have a low educational performance which *corresponds* to her low cognitive ability rather than a discrepancy between those measures. *See* Tennessee State Board of Education, Specific Learning Disabilities Eligibility Standard (SLD), 2, 5 (Nov. 2, 2007).

In summary, Ms. Crosswait noted that although Plaintiff's full-scale IQ score was "indicative" of "extremely low" intellectual functioning, the range in which she functioned—the 95% confidence interval—extended into the "borderline" category (Tr. 165, 168). Ms. Crosswait "suspected" that due to Plaintiff's scores of 86 on both the ABAS-II and WJ-III tests, Plaintiff's "true" full-scale IQ score was "higher in the confidence interval and [wa]s actually in the [b]orderline range of functioning" (Tr. 168). Accordingly, Ms. Crosswait diagnosed Plaintiff with borderline intellectual functioning (Tr. 168), which corresponds generally to an IQ score between 71 and 84. *See* Am. Psychiatric Ass'n, *Disorders Usually First Diagnosed in Infancy, Childhood, or Adolescence*, DSM-IV (4th ed. 2002). With written (as opposed to oral) assignments and tests, Ms. Crosswait believed Plaintiff could successfully obtain her GED certificate, and after that, might benefit from subsequent vocational rehabilitation. Ms. Crosswait indicated Plaintiff might be better suited to clerical work, noting she displayed a "relative strength" in the "Processing Speed of clerical skills" (Tr. 168).

Two months later, in August 2005, Ms. Crosswait evaluated Plaintiff again "to determine her . . . psychosocial status" (Tr. 169). Ms. Crosswait diagnosed Plaintiff with generalized anxiety disorder and moderate, recurrent, major depressive disorder (Tr. 172). As relevant here, Ms. Crosswait noted that Plaintiff had an "extremely low" working memory and "extremely low" story recall, suggesting "very impaired immediate memory" (Tr. 171). Plaintiff also had "significant problems with a short attention span . . . and distractibility" (Tr. 172).

The following year, Plaintiff was evaluated by Art Stair, M.A., also a licensed psychological examiner (Tr. 212-17). Despite her "fair" attention span, Mr. Stair noted that Plaintiff demonstrated a "limited ability to think abstractly" and "below-average ability in answering logic-based problems."

(Tr. 214). Plaintiff also took "an inordinate amount of time" to answer elementary mathematical equations (Tr. 214), a task which Ms. Crosswait had observed was one of Plaintiff's relative strengths (Tr. 167). Mr. Stair estimated that Plaintiff was in the "upper borderline intellectual functioning range," but he recommended objective testing to quantify her abilities (Tr. 214, 216).[2] He opined that Plaintiff's "ability to comprehend and implement multi-step, complex instructions" was "marginal" (Tr. 216). The same month, Marianne E. Filka, M.D., performed a physical examination of Plaintiff, and she opined that Plaintiff had "low average intellectual functioning" (Tr. 220). Dr. Filka noted, however, that she did not specifically test Plaintiff's ability to perform calculations or abstract thinking (Tr. 222).

In addition, two reviewing physicians offered opinions regarding Plaintiff's intellectual abilities. In July 2006, George T. Davis, Ph.D., opined that Plaintiff exhibited "low ave[rage] to borderline IQ w[ith]o[ut] lifelong h[istory] of m[ental] r[etardation]" (Tr. 225). Dr. Davis stated that Plaintiff's achievement scores suggested a "low average" IQ (Tr. 236). In January 2007, Larry W. Welch, Ed.D., offered an opinion that was essentially the same as Dr. Davis's (Tr. 289). Both Drs. Davis and Welch suggested that Plaintiff's low IQ was evidence of an "organic mental disorder"[3] rather than mental retardation (*see* Tr. 225, 289).

---

[2] It appears Mr. Stair did not have the benefit of Plaintiff's test results from the WAIS-III or other objective tests.

[3] An organic mental disorder may be shown by a "[l]oss of measured intellectual ability," due to some "specific organic factor" while mental retardation is shown by intellectual and adaptive deficits occurring during the developmental period. See 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 §§ 12.02 and 12.05

# III.    ALJ'S FINDINGS

## A.    Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following

a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v).

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to

show the extent of her impairments, but at step five, the Commissioner bears the burden to show

that, notwithstanding those impairments, there are jobs the claimant is capable of performing. *See*

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

## B.    ALJ's Application of the Sequential Evaluation Process

At step one of this process, the ALJ found Plaintiff was not performing substantial gainful

activity (Tr. 18).  At step two, the ALJ found Plaintiff had a severe "combination" of impairments:

back, neck, knee, and right arm problems, low average to borderline intellectual function, and an

affective disorder (Tr. 18).  At this step, the ALJ did not engage in any discussion about why he

found Plaintiff to be functioning in the low average to borderline range. At step three, of chief importance here, the ALJ found Plaintiff did not have any impairment or combination of impairments severe enough to meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 § 12.05 (Tr. 19). Specifically, the ALJ found that Plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.02 or 12.04 (Tr. 19). The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform a limited range of light work (Tr. 20). Due to Plaintiff's borderline intellectual functioning, the ALJ found Plaintiff would be limited to "simple, routine, repetitive jobs" (Tr. 20). At step four, the ALJ observed that Plaintiff had no relevant past work (Tr. 24). With respect to the final step, the ALJ relied on the hearing testimony of a vocational expert, who opined that someone with Plaintiff's age, education, experience, and RFC could perform entry level clerical work as well as several other representative jobs (Tr. 25, 39). Accordingly, the ALJ concluded there were jobs existing in significant numbers in the national economy that Plaintiff could perform, and Plaintiff was therefore not disabled (Tr. 25-26).

IV.     ANALYSIS

Plaintiff specifically challenges the ALJ's decision at step three. She contends the ALJ erred by failing to consider whether she met listing 12.05C, which is designed specifically for mildly mentally retarded people with additional severe impairments. *See Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 270 (6th Cir. 1991).

A.     Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375

F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, 2009 WL 2579620, *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory

claim of error without further argument or authority may be considered waived).

**B.     Listing 12.05C**

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  The claimant bears the burden of proving every element of the listing.  *King v. Sec'y Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1986).

As noted, Plaintiff argues the ALJ should have found that she met listing 12.05C.[4]  While the ALJ's opinion explicitly considered two listed mental impairments, 12.02 (organic mental disorder) and 12.04 (affective disorder), the ALJ did not explicitly consider listing 12.05 (mental retardation).[5]  Listing 12.05 states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

---

[4] Plaintiff did not argue that she was mentally retarded at the administrative hearing.  Some courts have held that an ALJ need only consider the listings raised during the hearing, *see Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009), but I **CONCLUDE** such a rule cannot be applied to unrepresented claimants whose alleged disability is premised on a mental impairment.  *See Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999) (holding that *represented* claimants must raise all issues at the administrative hearing or else waive them).  Indeed, while the claimant bears the burden to prove her disability, the ALJ has a "special duty" to develop the record and elicit testimony where a claimant of limited intelligence appears without counsel at the administrative hearing.  *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983) (quoting *Smith v. Harris*, 644 F.2d 985, 989 (3d Cir. 1981)).  *See also Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 344-45 (6th Cir. 2008) (distinguishing *Lashley* on the basis that the claimant did not suffer from any impaired mental ability).

[5] The ALJ did not specifically mention listing 12.05, nor did he devote any written consideration to the criteria of that listing.  In connection with listings 12.02 and 12.04, the ALJ considered the "B" and "C" criteria for evaluating mental impairments.  Mental retardation, however, requires a substantively different analysis, which the ALJ's opinion does not contain.  *See generally* 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 § 12.00.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . . .

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; . . . .

20 C.F.R. Pt. 404, Subpt. P, App'x. 1 § 12.05.  As Plaintiff argues, if she met or equaled the criteria of listing 12.05C, then the sequential evaluation process should have ended at step three with a finding of disability.[6]  See *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).

The Commissioner argues that the ALJ was not required to discuss listing 12.05C under the circumstances here, but that he did in fact consider the relevant facts, and that any error in his opinion is harmless.  Thus, this case presents three distinct issues, which will be considered serially: first, whether the ALJ was required to make a finding regarding listing 12.05C; second, whether the ALJ's opinion, while not specifically mentioning that listing, shows that such a finding was made; and third, whether any error in the ALJ's opinion requires reversal.

### 1.    Was the ALJ Required to Consider Listing 12.05C?

#### a.    The ALJ's Step-Two Finding of Borderline Intellectual Functioning

Preliminarily, the Commissioner argues that the ALJ was not required to consider mental retardation at step three because he found at step two that Plaintiff was not mentally retarded, but was instead functioning in the "borderline" range, a finding which, according to the Government, Plaintiff does not challenge.  To be sure, the Commissioner must at *least* consider the listings

---

[6] If the listing is met, the finding of disability is final even if Plaintiff possesses the RFC to perform some types of work.  See *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) ("If the impairment meets or equals [the listing], the claimant is conclusively presumed to be disabled."); *Shaw v. Chater*, 221 F.3d 126 (2d Cir. 2000) (claimant establishes an "irrebuttable presumption" of disability when she meets or equals a listing).

corresponding to a claimant's "severe" impairment(s). *See* [20 C.F.R. § 404.1520a(d)(2)](); [*Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 438 (6th Cir. 2010)]() (noting that at step three, the ALJ determines whether the claimant "is suffering from a severe impairment which . . . meets or equals a listed impairment"). But a conclusory step-two finding of borderline intellectual functioning does not excuse the ALJ from considering the extent of a claimant's intellectual impairments at subsequent steps. Put simply, step two is not the stage at which the ALJ should, without comment, make fine distinctions between two impairments, both supported by the record, which differ only in their degree. Instead, at step two, the ALJ should gather up all a claimant's impairments which are worth consideration, and he should then consider them in the remainder of his analysis. *See* [*Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)]() (noting that step two is a *de minimis* hurdle which exists only to "screen out totally groundless claims."); [*Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009)]() (stating that if ALJ finds any severe impairments, he must consider all impairments at subsequent steps). Of course, if there is conflicting evidence in the record regarding whether the claimant suffers from an impairment at all, even a minimal one, then it is up to the ALJ to resolve that conflict. *See* [*Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 436 (6th Cir. 2010)](). There is no dispute, however, that Plaintiff has an intellectual impairment that limits her ability to work to some degree. Indeed, the ALJ limited Plaintiff's RFC to "simple, routine, repetitive jobs" (Tr. 20). I **CONCLUDE** therefore that the ALJ was obligated to account for Plaintiff's intellectual limitations at the subsequent steps of the sequential evaluation.

### b. Threshold for Consideration of Listing 12.05C

Plaintiff hangs her step-three argument on the holding of [*Abbott v. Sullivan*, 905 F.2d 918 (6th Cir. 1990)](). In [*Abbott*](), the court held, based on the claimant's IQ score alone, that the

Commissioner erred in failing to consider listing 12.05. *Id.* at 924-25. According to Plaintiff, *Abbott* stands for the proposition that "evidence that the [c]laimant's IQ is in the range of 60-69 requires that the [Commissioner] explicitly consider" listing 12.05C [Doc. 13 at 5].[7] The *Abbott* court, however, did not hold that a qualifying IQ score will *always* trigger the ALJ's duty to consider the listing for mental retardation. Rather, the court held, given the facts of that case, that the claimant's IQ score raised a "substantial question" as to whether the listing was met. *Id.* at 925. Central to the *Abbott* court's analysis was the observation that a claimant with additional severe impairments may qualify for the listing *solely* on the basis of an IQ score less than 70, without any assessment of her degree of functional impairment. *Id.* at 924.

Since *Abbott* was decided, however, the Sixth Circuit Court of Appeals ("Sixth Circuit") clarified that a qualifying IQ score, even in combination with other "severe" impairments, does not, without more, satisfy the listing. *Foster*, 279 F.3d at 354. Instead, a claimant must also meet the elements of the listing's "diagnostic description"—viz., "significantly subaverage general intellectual functioning with deficits in adaptive functioning before age 22." *Id.* at 354-55 (internal quotes omitted). In light of *Foster*, I **CONCLUDE** that an IQ score of 70 or less may not always raise a substantial question as to whether a claimant is mentally retarded. For example, the record may show unequivocally that a claimant experiences intellectual difficulties as a result of an accident occurring after the age of 22. In such a case, the claimant might meet another of the listed

---

[7] The courts to consider this question have reached divergent results. *Compare Alcorn v. Astrue*, 2008 WL 1790192, *4 (E.D. Ky. Apr. 18, 2008) (holding that although the ALJ failed to explicitly address Listing 12.05C, the claimant's reliance on *Abbott* was "misplaced" because the ALJ found the other components of the listing were lacking) *with Isham v. Astrue*, 2010 WL 1957362 (E.D. Tenn. Jan. 13, 2010) (holding that "under the holding in *Abbott*, the ALJ was required to expressly analyze Plaintiff's impairments under § 12.05(C) because the record contained IQ scores under 70.").

impairments, but it would not be listing 12.05C, and to require the ALJ to say so would be a waste of ink. In short, then, the Court must determine whether there was a "substantial question" regarding whether Plaintiff met listing 12.05C. As explained below, I **FIND** that there was.

As noted above, listing 12.05C provides that a claimant with a valid IQ score of 60-70 and another impairment causing a significant work-related limitation of function will be found disabled if she experiences significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before age 22. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.05; *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492 n.2 (6th Cir. 2010). The Court will address these components of the listing in order.

### i.     Valid IQ Score of 70 or Less

There is no doubt Plaintiff had a qualifying IQ score. Neither the ALJ in his opinion nor the Commissioner on appeal has challenged the validity of the testing performed by Ms. Crosswait. To the contrary, the ALJ gave "great weight" to her findings (Tr. 23). Ms. Crosswait herself noted that Plaintiff was motivated and cooperative during testing, and believed Plaintiff's scores to be valid. Furthermore, while Ms. Crosswait opined that Plaintiff's "true" *full-scale* IQ score was likely in the "borderline" category, the Commissioner is required to use the claimant's *lowest* IQ score. 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.00 at D ("In cases where more than one IQ is customarily derived from the test administered, i.e., where verbal, performance, and full-scale IQs are provided as on the WAIS, the lowest of these is used in conjunction with listing 12.05."). As Plaintiff points out, therefore, the relevant IQ score for purposes of the listing is Plaintiff's verbal IQ score of 63, which comfortably satisfies the listing.

### ii.    Other Severe Impairments

Similarly, there is no doubt that Plaintiff suffered from "a physical or other mental impairment imposing an additional and significant work-related limitation of function." As the ALJ found, and neither party contests, Plaintiff's various physical maladies restricted her to a limited range of light work. *See* [20 C.F.R., Pt. 404, Subpt. P, App'x 1 § 12.00](#) (equating the phrases "significantly limits your physical or mental ability to do basic work activities" and "is a 'severe' impairment(s)"); [Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury ("Mental Disorders"), 65 Fed. Reg. 50746, 50772 (Aug. 21, 2000)](#) (explaining that a "severe" impairment, as defined in step two of the sequential evaluation, is equivalent to a significant work-related limitation of function).

### iii.    Diagnostic Description

Because the requirements of Paragraph C are indisputably met, the ALJ was required to consider listing 12.05C if there was a "substantial question" regarding whether the diagnostic description was satisfied. The Commissioner argues that Plaintiff need not be considered for the listing for mental retardation unless she can show, "as an initial matter," that she is mentally retarded [Doc. 15 at 8]. The Commissioner's reasoning, however, begs the question. Listing 12.05 *defines* mental retardation; it does not require a claimant to prove mental retardation separately *in addition* to satisfying that definition. The Commissioner nevertheless argues that Plaintiff cannot meet the listing for mental retardation because she was not diagnosed with mental retardation [Doc. 15 at 8]. Specifically, the Commissioner argues that Plaintiff did not "establish mental retardation" because Ms. Crosswait, whose testing Plaintiff relies on, did not believe that Plaintiff met "the DSM-IV criteria for mental retardation" [Doc. 15 at 7-8].

The Commissioner's own regulations refute this argument. The SSA has never adopted any precise diagnostic criteria for listing 12.05, but it has *explicitly* declined to use the DSM criteria. Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018, 20022 (Apr. 24, 2002). The Agency noted that the listing for mental retardation is "not restricted" to a particular diagnostic methodology, but is designed instead to "captur[e] the essence" of several different methodologies. *Id.* In other words, it is up to the ALJ, based on the record evidence, to determine whether a claimant meets the listing. A medical diagnosis one way or the other is simply not conclusive.[8] Instead, listing 12.05 itself provides the relevant diagnostic criteria for mental retardation. *Id.* (stating that the "the definition of [mental retardation] used by the SSA in the listings . . . establishes the necessary elements."); Mental Disorders, 65 Fed. Reg. at 50773 ("listing 12.05 contains . . . the diagnostic criteria of mental retardation."). Furthermore, Paragraph C of the listing also provides the threshold of severity for a finding of mental retardation. 20 C.F.R., Pt. 404, Subpt. P, App'x 1 § 12.05 ("[t]he required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied."). Thus, to show the requisite severity of her impairment, Plaintiff needed only to show that she met the criteria of Paragraph C, and as explained above, she did.

Still, the law is clear that a claimant, *in addition* to meeting the requirements of Paragraph C, must satisfy the diagnostic description of the listing. *Foster*, 279 F.3d at 354. That description contains three requirements: significantly subaverage intellectual functioning, current deficits in

_____

[8] This is especially true here, where Plaintiff missed the DSM diagnosis, in Ms. Crosswait's opinion, by a single IQ point. As explained above, Ms. Crosswait opined that Plaintiff's true full-scale IQ score fell between 63 and 71, where 71 marks the low end of the "borderline" category of intellectual functioning.

adaptive functioning, and onset before age 22.[9]  In the instant matter, there is at least a substantial

question with respect to whether these requirements were met.  First, Plaintiff's valid IQ score itself

establishes that she suffers from significant intellectual deficits.[10]  Second, there was substantial

evidence that she also suffered from adaptive deficits.[11]  For example, Plaintiff was noted by Ms.

Crosswait to have "significant problems with a short attention span . . . and distractibility (Tr. 172),

and her composite score on the ABAS-II was "below average" (Tr. 166).  Third, there was also

substantial evidence that Plaintiff's difficulties manifested during the developmental period.

Plaintiff's current valid IQ score, by itself, does not permit an inference of developmental deficits,

*see Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492 n.1 (6th Cir. 2010), but Plaintiff has also

produced evidence beyond her IQ score:  she was held back in the first grade and was in special

education in the seventh and eighth grades (Tr. 94, 164, 214).  Taken together with Plaintiff's school

performance, the evidence of Plaintiff's current intellectual and adaptive functioning can easily

---

[9] The phrasing of the diagnostic description is somewhat ambiguous.  It could be read to require that both intellectual deficits and adaptive deficits have manifested before age 22, or it could be read to require only that adaptive deficits have manifested before age 22.  The subsequent clause, however, restates and clarifies the matter:  "i.e., the evidence demonstrates or supports onset of *the* impairment before age 22." 20 C.F.R., Pt. 404, Subpt. P, App'x 1 § 12.05 (emphasis added).  Thus, the SSA considers mental retardation to be a single impairment marked by two types of deficits—intellectual and adaptive—both of which must be present prior to age 22.

[10] IQ is the measure of a claimant's deviation from the average, 20 C.F.R., Pt. 404, Subpt. P, App'x 1 § 12.00 at D(6)(c).  Paragraphs B, C, and D of listing 12.05, furthermore, contain specific qualifying IQ ranges.  The requirement that intellectual deficits be "significant," therefore, cannot be stricter than these specific IQ ranges, because the listing would otherwise exclude claimants it was clearly designed to include.  *But see Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003) (mentioning that although Plaintiff had an IQ score of 67, "[n]one of the psychologists concluded that [she] suffered from 'significantly subaverage intellectual function'").

[11] A "loss of adaptive functioning," according to SSA regulations, is "manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R., Pt. 404, Subpt. P, App'x 1 § 12.00 at C(4).

support the conclusion that her deficits are longstanding.  *See* [Mental Disorders, 65 Fed. Reg. at](#) [50772](#) (explaining that developmental deficits may be inferred from "evidence of current functioning").

As the Commissioner points out, there is also evidence in the record that Plaintiff did *not* have significant deficits in adaptive functioning.  With respect to activities of daily living, Plaintiff's grooming was reportedly normal (Tr. 162), and she was able to care for her daughters by shopping and doing household chores (Tr. 35).  Ms. Crosswait also expressed optimism that Plaintiff could obtain her GED and could benefit from vocational training (Tr. 168).  There is also some evidence that Plaintiff's deficits did not manifest during the developmental period.  Two reviewing doctors, for example, opined that Plaintiff did not have a lifelong history of mental retardation (Tr. 225, 289). *See* [*Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 874 (6th Cir. 2003)](#) (opinion of three psychologists that the claimant was of "low intelligence but not mentally retarded" was substantial evidence supporting the ALJ's finding).  Still, in light of this conflicting evidence, I **CONCLUDE** that there was a substantial question regarding Plaintiff's eligibility for listing 12.05C.  In other words, it was not obvious from the record that Plaintiff could not meet the listing.  Consequently, under *[Abbott](#)*, the ALJ was obligated to consider listing 12.05C.

### 2.      Did the ALJ Nonetheless Adequately Consider the Relevant Evidence?

The Commissioner argues that although the ALJ did not specifically mention listing 12.05C, "the ALJ provided adequate articulation" of his finding that Plaintiff did not suffer from mental retardation [Doc. 15 at 9].  For the sake of argument, the Court will accept herein the premise that an ALJ, without explicitly mentioning a particular listing, may nonetheless make findings sufficient to determine whether that listing is met.  Thus, in order to dismiss listing 12.05C, the ALJ would

have had to find that at least one of its necessary criteria was missing. Having dispensed with the Government's arguments concerning three of those criteria (IQ, other severe impairments, and significantly subaverage intellectual performance), the record is equivocal only with respect to adaptive deficits and manifestation before age 22. The question before the Court, therefore, is whether the written decision shows that the ALJ considered and rejected the evidence in favor of adaptive deficits or manifestation before age 22. I **FIND** that it does not.

### a.     Adaptive Deficits

With respect to the evidence of adaptive deficits, the Court must first articulate the legal standard the ALJ should have applied. That is no small task, because the regulations do not define how serious these adaptive deficits must be. It is clear, at least, that they need not be so serious that the "B" criteria would be met,[12] or that the claimant would be precluded from performing all work.[13]

---

[12] The ALJ did make findings with respect to Plaintiff's impairment in several functional categories when he considered the "B" criteria in connection with listings 12.02 and 12.04. However, the absence of an impairment severe enough to meet the "B" criteria does not preclude the claimant from meeting Listing 12.05C. The "B" criteria are also contained in paragraph D of listing 12.05, and a claimant who satisfies the "B" criteria will therefore also qualify for listing 12.05D. *See* 20 C.F.R., Pt. 404, Subpt. P, App'x 1 §§ 12.00, 12.05. Consequently, if a claimant were required to meet the "B" criteria in order to satisfy the diagnostic description's requirements for adaptive deficits, paragraphs A, B, and C of listing 12.05 would all be superfluous.

[13] A claimant who satisfies one of the listings is conclusively presumed to be disabled, but she may nonetheless be able to perform some work. *See Wilson v. Astrue*, 2009 WL 69237, *7 (E.D. Ky. 2009) (concluding that a claimant who has performed semi-skilled work, especially at the lower end of the category, is still eligible for listing 12.05C). Although it may seem incongruous to find a claimant disabled who can perform substantial gainful activity, which is defined by statute as an "inability to engage in any substantial gainful activity," 42 U.S.C. § 416(i)(1), such an outcome is inherent in the nature of the sequential evaluation process. At step three, the agency has not yet even determined the claimant's RFC. Indeed, the listing implicitly recognizes that a claimant with an IQ score may be intellectually and adaptively capable of performing some work, but should nonetheless be found disabled because her other severe impairments further limit her job prospects. Thus, the ALJ's finding that Plaintiff could perform "simple, routine, repetitive jobs" (Tr. 20), even though it is supported by the record, does not preclude the existence of adaptive deficits for purposes of listing 12.05C.

On the other hand, a claimant's adaptive deficits must be more than "potential or moderate." *See Payne v. Comm'r of Soc. Sec.*, 2008 WL 2894482, at *4 (E.D. Tenn. Jul. 23, 2008). The Sixth Circuit has articulated the inquiry as follows: is the claimant capable of performing "relatively complicated tasks" which are inconsistent with the listing? *See Foster*, 279 F.3d at 355.

The ALJ specifically credited the findings and opinions of Ms. Crosswait, including Plaintiff's score of 86, or "below average," on a test which measures adaptive functioning (Tr. 22, 24). That score was a composite of several subtests, on which Plaintiff's scores ranged from "extremely low" (in functional academics) to "average" (in self-direction, social skills, home living, health and safety, and self-care) (Tr. 165-66). The ALJ also credited Dr. Stanley's opinion that Plaintiff appeared able to understand and follow simple instructions in a work setting, but that her ability to understand and follow multi-step, complex instructions was marginal (Tr. 23, 24). The ALJ noted further that Dr. Stanley believed Plaintiff could concentrate on work tasks and could responsibly manage her own funds (Tr. 23). Similarly, the ALJ credited Dr. Davis's opinion that Plaintiff could understand, remember, and attend to "non-complex" tasks and could interact with co-workers (Tr. 23, 24).

While the weight given to these opinions by the ALJ is supported by substantial evidence, the opinions themselves do not describe the sorts of "relatively complicated tasks" which courts have found inconsistent with the presence of adaptive deficits. The ability to perform "non-complex" instructions and to perform self-care functions and household chores, in other words, is not necessarily inconsistent with listing 12.05C. *See Brown*, 948 F.2d at 270 (claimant's self-care and chores were not inconsistent with listing 12.05C); *Wilson v. Astrue*, 2009 WL 69237, *5 (E.D. Ky. 2009) (claimant's ability to sustain concentration and interact with others were not inconsistent with listing 12.05C). Consequently, I **CONCLUDE** that the ALJ did not make any finding with respect

to adaptive deficits that would have precluded Plaintiff from meeting Listing 12.05C.[14]

### b.    Age of Onset

Similarly, I **CONCLUDE** that the ALJ made no finding with respect to when Plaintiff's impairments initially manifested. As noted above, Plaintiff's school history, combined with her current valid IQ score, is substantial evidence that her impairment is longstanding, but the ALJ neither rejected nor accepted that evidence, and indeed, failed to mention any evidence whatsoever showing whether Plaintiff's impairment manifested before age 22.[15]

Therefore, even if accepting the legal proposition that an ALJ may adequately consider the evidence relevant to a particular listing without specifically mentioning that listing, the ALJ did not do so in this case.

### 3.    Was the ALJ's Failure to Consider the Listing Harmless?

As set forth above, I **FIND** the ALJ was required to consider listing 12.05C, but failed to do so. Given the lack of discussion of mental retardation in the ALJ's opinion, there is no choice but to conclude either that the ALJ overlooked the evidence of mental retardation, or considered but rejected it for grounds he did not articulate. If the former, then the decision is not supported by

---

[14] In *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 697-98 (6th Cir. 2007), a case with many similarities to this one, the court held that a claimant's diagnosis of borderline intellectual functioning, combined with his activities of daily living and an ability to perform simple work tasks, was substantial evidence that he did not experience deficits in adaptive functioning. In *West*, however, the ALJ made an explicit finding that the claimant lacked adaptive deficits, and the court noted that the claimant failed to provide *any* evidence of such deficits. Thus, in the absence of any evidence to the contrary, the ALJ's decision was supported by substantial evidence. Here, on the other hand, the evidence creates a substantial question regarding the existence of adaptive deficits, but the ALJ did not resolve it.

[15] The ALJ credited the opinion of Dr. Davis, who opined that Plaintiff did not have a lifelong history of mental retardation (Tr. 225), but the ALJ cited his opinion only for other unrelated content. The same is true of Ms. Crosswait's opinion, which speculated that Plaintiff's "disruptive childhood" might have affected her schooling (Tr. 169).

substantial evidence and remand is required to allow the Commissioner to consider in the first instance whether Plaintiff qualified for the listing.  *See Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 748-50 (6th Cir. 2007).  If the latter, then remand is proper even if there might be substantial evidence in the record that supports the ALJ's ultimate conclusion.  *See SEC v. Chenery*, 332 U.S. 194, 196-97 (1947).  The Court is fully aware of its obligation to defer to the agency's decision where it is supported by substantial evidence.  42 U.S.C. § 405(g).  As a corollary to this principle of deference, however, a reviewing court may affirm an agency's decision only on grounds articulated by the decisionmaker.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983) (stating that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself").  Thus, a court should not speculate what the ALJ *might* have decided. *Chenery*, 332 U.S. at 196-97 ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."); *Karger v. Comm'r of Soc. Sec.*, 2011 WL 477682, *16 (6th Cir. Feb. 10, 2011) (unpublished) ("It is not . . . the district court's role[] to scour the record for evidence . . . which the ALJ *might* have relied on and which *could* support a finding of no-disability *if* the ALJ actually considered it.").  *See also Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985).

Accordingly, the matter must be remanded unless it is clear that the contested issue, even if it had been resolved in the claimant's favor, would not have changed the ultimate outcome.  *See Berryhill v. Shalala*, 1993 WL 361792, *7 (6th Cir. Sep. 16, 1993) (unpublished) (*quoting Kurzon v. United States Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976)).  That is not the case here.  If the Commissioner determines that Plaintiff qualifies for listing 12.05C, then she will be conclusively presumed disabled for the time period in question.  Therefore, I **RECOMMEND** that this matter be

**REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g). *See Hendricks v. Astrue*, 2009 WL 648610, *9 (S.D. Ind. Mar. 11, 2009) (remanding where evidence could have supported a finding that the claimant met listing 12.05C).

## V. CONCLUSION

Having carefully reviewed the administrative record and the parties' pleadings, I

**RECOMMEND:**[16]

(1) Plaintiff's motion for summary judgment [Doc. 12] seeking remand under Sentence Four of 42 U.S.C. § 405(g) be **GRANTED**.

(2) Defendant's motion for summary judgment [Doc. 14] be **DENIED**.

(3) The Commissioner's decision denying benefits be **REVERSED** and **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g) for action consistent with this Report and Recommendation.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[16] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

This document contains hyperlinks to other documents. Such links are provided for the user's convenience only, and the Court does not guarantee their functionality or accuracy. Any link which directs the user to a document other than the document cited in the text will not supersede the textual citation. The Court does not endorse the content of, or any provider of, any document maintained by any other public or private organization.